IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **4:13CV3103** |
| vs. | |
| $25,180.00 IN UNITED STATES CURRENCY, | **FINDINGS, RECOMMENDATION, AND ORDER** |
| Defendant. | |

The government's complaint seeks forfeiture of $25,180.00 in United States currency seized during a traffic stop on December 14, 2012. (Filing No. 1). The claimant, John Anderson, seeks an order for return of the seized funds. (Filing No. 12). Citing violations of his Fourth Amendment rights, the claimant has filed a motion challenging the traffic stop, his detention, the officers' questioning during the stop, the search of his vehicle, and the seizure of the money. (Filing No. 23). Anderson, a white, middle-aged male from California, also claims the traffic stop and his detention were based on unlawful profiling based on race and having California license plates.

The evidentiary hearing on the claimant's motion lasted over five hours and was held in three installments occurring on February 27, 2014, March 21, 2014, and April 11, 2014. At his request, the pro se claimant appeared by telephone. The government voluntarily scheduled and produced all law enforcement officers the claimant wanted to question. At the close of the hearing, the claimant requested post-hearing briefing. The claimant's brief was filed on April 24, 2014. The government elected not to file a response. The matter is now fully submitted.

For the reasons discussed below, the claimant's Fourth Amendment claims for suppression of evidence will be denied.

STATEMENT OF FACTS

At approximately 11:40 a.m. on December 14, 2012, Seward County Deputy Sheriff David Frye was patrolling Interstate 80 near mile marker 375 when he noticed a westbound silver BMW X5. (Filing No. 53, at CM/ECF p. 17). Deputy Frye saw the vehicle merge from the left (passing) lane into the right lane with no turn signal activated until the BMW tires had already crossed the center line. (Filing No. 53, at CM/ECF p. 24). Deputy Frye activated his overhead lights to stop the vehicle for failure to properly signal a lane change. Activating the overhead lights also started the officer's in-car camera. Exhibit 1 is the unaltered video and audio recording of the traffic stop as captured using the patrol vehicle's camera and the officer's body microphones.

The claimant, John Anderson, was driving the BMW. The vehicle did not stop quickly, but rather travelled two to three times further than normal before pulling into the interstate rest area near Goehner, Nebraska near mile marker 373. (Filing No. 53, at CM/ECF p. 23-26; Filing No. 55, at CM/ECF p. 32).

When Deputy Frye activated his overhead lights, Trooper Robert Pelster was passing by on eastbound Interstate 80 and noticed Deputy Frye was stopping a BMW X5. Trooper Pelster remembered seeing a similar vehicle—a silver BMW X5 with upgraded honeycomb wheel rims and California license plates—travelling eastbound on Interstate 80 the previous day. (Filing No. 54, at CM/ECF pp. 10-12). Trooper Pelster sent a text message to Deputy Frye, advising Deputy Frye that if the BMW had California plates, Trooper Pelster had seen that same vehicle heading eastbound only a day earlier. (Filing No. 53, at CM/ECF p. 31; Filing No. 54, at CM/ECF p. 12).

After Anderson parked in the Goehner rest area, Deputy Frye approached the passenger's side of the BMW and requested Anderson's driver's license, and the

2

registration and insurance card for the vehicle.  (Filing No. 53, at CM/ECF p. 26-27).
Deputy Frye asked Anderson where he was heading.  Anderson stated he was returning
home from visiting family in Sioux Falls, South Dakota, and he was trying to complete
the trip before the predicted snow storm hit.

Deputy Frye asked Anderson to be seated in the front passenger seat of the patrol
vehicle.  (Filing No. 53, at CM/ECF p. 28-29).  After Anderson was pat-searched and
sitting in the patrol car, the officer began completing a warning ticket.  He also asked
Anderson to explain the purpose of the trip and the route he used to reach Sioux Falls.
Anderson explained that he was in Sioux Falls a week and a half helping his father, a
contractor, with a construction project, and visiting his grandma who was ill.  In response
to follow up questions, Anderson stated he used Interstate 29 north out of Omaha to reach
Sioux Falls, and when he arrived, stayed at his father's home.  (Filing No. 53, at CM/ECF
p. 30).  Responding to additional questions, Anderson explained he was raised in the
Sioux Falls area, but had moved to California in 1990, where he previously went to
school and worked as a teacher, and now assists borrowers in negotiating and settling
their debts.  When asked about the BMW, Anderson stated it was a 2008 model and he
recently purchased it for $5,000 to $6,000 below Blue Book.

Approximately five minutes after the stop was initiated, Deputy Frye contacted
dispatch to check on Anderson's driver's license and criminal history, and the registration
for the BMW.  As the officer waited for a response and completed the warning ticket, he
asked more questions.  In response, Anderson explained that he was en route back to his
California home, and depending on the route he would take to avoid the oncoming storm,
would either stay with a friend in Colorado or in a motel in Wyoming.  Anderson stated
he was driving rather than flying because he wanted to have a vehicle while in South
Dakota, and but for the storm, he had planned to stop and ski in Colorado during the trip
home.  Anderson denied having any criminal history other than an assault as a juvenile.

Approximately 11 minutes after initiating the stop, Deputy Frye exited the patrol vehicle to check the VIN on the BMW.  As he passed the BMW, he noticed bags on the front and backseat and air fresheners.  He returned to the patrol vehicle to complete the traffic stop.

As the officer was finishing the paperwork and was about to return Anderson's license, and the vehicle insurance card and registration, the officer noticed the vehicle registration was not valid until January 2, 2013.  (Filing No. 53, at CM/ECF p. 33).  He also noticed the license plates were purchased on December 10th of 2012, only four days earlier, in California.  (Filing No. 53, at CM/ECF p. 34).

Deputy Frye returned Anderson's documents and gave him the warning ticket approximately 13 minutes after the stop was initiated.  He then asked if Anderson would answer additional questions, and asked if weapons, cocaine, marijuana, methamphetamine, heroin, or large amounts of cash were located in the vehicle. Anderson denied possession of any of these items.  (Filing No. 53, at CM/ECF p. 40).

Deputy Frye asked if he could search the vehicle.  Anderson would not consent. Deputy Frye asked if Anderson would wait for a canine to arrive.  Anderson again denied consent, explaining he wanted to get ahead of the oncoming storm.  (Filing No. 53, at CM/ECF p. 40-41).

Deputy Frye advised Anderson that even absent Anderson's consent, the officer was calling for a canine unit.  The call was made approximately 15 minutes after the stop was initiated.  (Filing No. 53, at CM/ECF p. 41).

Two canine teams are typically available in Seward County, Nebraska.  But on December 14, 2012, one of the dogs was recovering from surgery and could not be called

to duty.  Deputy Frye therefore contacted Seward Deputy Sheriff Vance at the deputy's home, reaching Deputy Vance while he was still in bed.  Deputy Vance and his canine, Igor, deployed to the scene and arrived approximately 36 minutes after being called—approximately 50 minutes after the stop was initiated.  (Filing No. 53, at CM/ECF p. 46, 83; Filing No. 54, at CM/ECF p. 44, 61).

While Deputy Frye and Anderson remained seated in the vehicle awaiting the canine unit, Deputy Frye again asked if there was a large amount of cash in the vehicle. Anderson repeatedly denied having more than the money in his billfold, but as reflected in the video recording, his responses became more and more halted, evasive, and defensive as time passed.  The officer told Anderson that the officer was convinced there was a large amount of cash in the BMW.

Deputy Vance and Igor began training together in July of 2012, and were certified and qualified in accordance with the State of Nebraska standards as a canine detection team in August of 2012, (Filing No. 54, at CM/ECF p. 32, 34), recertifying annually thereafter.  (Filing No. 54, at CM/ECF p. 41-42).  Igor is trained to detect the odor of marijuana, cocaine, methamphetamine, heroin, LSD ,and ecstasy.  (Filing No. 54, at CM/ECF p. 37).  Prior to December 14, 2012, Deputy Vance and Igor had been deployed as a canine team on five prior occasions.

Upon arrival at the scene, Deputy Vance deployed Igor to perform a canine sniff of Anderson's BMW, walking counterclockwise beginning at the driver's side front bumper.  As he reached the passenger side, Igor alerted and then indicated at the seam between the two passenger side vehicle doors by jumping up at the vehicle and scratching.  (Filing No. 54, at CM/ECF p. 46).

Based on the canine alert, the officers began to search the BMW.  Approximately one hour after the traffic stop began, currency in various denominations and totaling

$25,180 was found in the vehicle.  The currency was under some clothing in a suitcase located in the backseat.  The officers also found a receipt from a Sioux Falls motel, where the Anderson apparently stayed the night before.  (Filing No. 53, at CM/ECF p. 75; Filing No. 55, at CM/ECF p. 11, 18, 39).

The currency was seized.  Deputy Frye asked if Anderson wanted to disclaim ownership of the currency, explaining that if the currency was Anderson's, he may be prosecuted for illegal drug activity.  Anderson did not disclaim the currency.  Frye asked if Anderson was willing to participate in a controlled delivery of the currency.  Anderson refused this option.  Anderson was arrested, handcuffed, and advised of his Miranda rights.  The BMW was towed from the scene.  Anderson seeks an order requiring the government to return the seized currency.

ANALYSIS

Liberally construing the pro se motion, Anderson moves to suppress all evidence obtained during the traffic stop.  If his motion is granted, the government will lack any admissible evidence to support its claims and Anderson will be entitled to entry of judgment in his favor as a matter of law.   Anderson claims Deputy Frye violated Anderson's Fourth Amendment rights by illegally stopping the vehicle; detaining Anderson; searching the BMW without Anderson's consent, probable cause, or a warrant; and seizing the currency found without probable cause or a warrant.

A.    The traffic stop.

Anderson claims he did not violate any traffic laws, and the traffic stop was based on unlawful profiling.  There is no evidence the BMW was stopped because Anderson is a middle-aged white male.  While waiting for the canine unit to arrive, Deputy Frye mentioned Caucasians were often used to transport drugs and cash for groups involved in

illegal drug activity.  But Anderson presented no evidence that he was stopped, detained, and his car searched because he is a middle-aged white man.[1]  See, e.g., U.S. v. Gomez Serena, 368 F.3d 1037, 1041 (8th Cir. 2004).  He has likewise failed to present any evidence showing he was stopped because the BMW had California license plates.

Anderson's vehicle was stopped for violating a Nebraska traffic law.  "It is well established that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver."  United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006).  "An officer is justified in stopping a motorist when the officer 'objectively has a reasonable basis for believing that the driver has breached a traffic law.' "  United States v. Mallari, 334 F.3d 765, 766-67 (8th Cir. 2003) (quoting United States v. Thomas, 93 F.3d 479-485 (8th Cir. 1996)).

While monitoring westbound traffic on Interstate 80, Deputy Frye observed the claimant's vehicle changing lanes without signaling in advance.  Under Nebraska law, a driver's failure to properly signal a lane change provides probable cause to initiate a traffic stop.  U.S. v. Escamilla, 301 F.3d 877 (8th Cir. 2002).  The traffic stop of Anderson's vehicle did not violate the Fourth Amendment.

2.      Prolonged Detention.

The defendant argues he was detained for an excessive period of time during the traffic stop.  Provided the officer is working diligently throughout, an officer may lawfully detain the occupants of a stopped vehicle until the purpose of the traffic stop, including writing any citation or warning ticket, has been completed.  United States v. Bueno, 443 F.3d 1017, 1025 (8th Cir. 2006)  In the absence of a warrant or reasonable

---

[1]  Moreover, a vehicle may be legally stopped for a traffic violation even if the officer's real motive for stopping the vehicle was to conduct a general criminal investigation.  Escamilla, 301 F.3d at 880.

suspicion of other criminal activity, the detention arising from a traffic stop becomes unlawful if "it is prolonged beyond the time reasonably required" to complete the stop itself.  U.S. v. Stringer, 739 F.3d 391, 395 (8th Cir 2014).  But vehicle occupants may be lawfully detained while the officer completes routine but somewhat time-consuming tasks related to the traffic violation, including a computer check of the vehicle registration and the driver's license and criminal history, and the preparation of a citation or warning.  Stringer, 739 F.3d at 395 (citing United States v. Quintero–Felix, 714 F.3d 563, 567 (8th Cir. 2013).  The officer may also ask questions about the purpose, origin, route, and destination of the trip.  Stringer, 739 F.3d at 395 (citing United States v. McCarty, 612 F.3d 1020, 1024–25 (8th Cir.2010)).

An officer may lawfully "expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot."  U.S. v. Chavez Loya, 528 F.3d 546 (8th Cir. 2008).  "To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed."  U.S. v. Bracamontes, 614 F.3d 813, 816 (8th Cir. 2010) (citing United States v. Shafer, 608 F.3d 1056, 1062 (8th Cir. 2010)).  "Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances," (Bracamontes, 614 F.3d at 816), and "any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity."  United States v. Jones, 269 F.3d 919, 926-27 (8th Cir. 2001).

Deputy Frye's suspicion of criminal activity began before the BMW was fully stopped.  Trooper Pelster, while passing on the eastbound lanes, recognized the vehicle. He sent a text to Deputy Frye stating that if the vehicle had California plates, it was

travelling east on the interstate the day before.  Deputy Frye read this text message before he approached the parked BMW and, upon request, received Anderson's driver's license and the vehicle registration.   From this documentation, Deputy Frye discovered the vehicle was registered in, and Anderson was from, California.  Deputy Frye asked about the purpose of Anderson's trip, and Anderson stated he had visited family in South Dakota.

Since the BMW was seen in Nebraska only one day earlier by Trooper Pelster, Anderson's explanation of the trip could be true only if Anderson had driven (and was now returning) the distance from Southern California to Southeastern South Dakota for a family visit which lasted less than a full day.  Anderson's trip explanation, considered in the context of all the facts presented, defied common sense:  It was highly likely Anderson was purposefully concealing the true purpose of his trip.  Deputy Frye had ample reason to suspect Anderson may be engaged in criminal activity, and the officer was entitled to ask additional, more probing questions during the traffic stop to either confirm or dispel his suspicion.[2]

As it turned out, Anderson's further responses confirmed Deputy Frye's suspicions.  When asked about the South Dakota trip, Anderson stated he was in the Sioux Falls area visiting family for a week or a week and a half—which contradicted Trooper Pelster's memory of the vehicle being in Nebraska the previous day.  Anderson claimed he could not remember what day or date he left from California, nor what time he had left Sioux Falls that day to return to California.

The vehicle registration provided the most persuasive evidence that Anderson was lying to Deputy Frye.  Approximately twelve minutes after the stop was initiated, as

---

[2] These additional questions did not prolong the detention arising from the traffic stop. As explained below, even with more thorough questioning and follow up questions by Deputy Frye, the traffic stop itself was complete in less than 15 minutes.

Deputy Frye was preparing to hand Anderson a completed warning ticket and return his driver's license and vehicle documents, the officer noticed that according to the vehicle registration, Anderson paid his vehicle taxes and registered the vehicle in California on December 10, 2012—only four days prior to the stop. The vehicle registration wholly contradicted Anderson's statement that he was in South Dakota for the past week, while simultaneously supporting Trooper Pelster's memory of seeing the same BMW travelling eastbound in Nebraska on December 13, 2012. Based on the totality of the information presented, Deputy Frye has reasonable suspicion to further detain Anderson following the completion of the traffic stop based on the officer's reasonable suspicion that criminal activity was afoot. U.S. v. Suitt, 569 F.3d 867 (8th Cir. 2009) (holding the officer did not violate the Fourth Amendment by asking a defendant more questions after termination of traffic stop and conducting a dog sniff of defendant's vehicle, where the defendant repeatedly gave hesitant, evasive, incomplete, and implausible answers to the officer's questions about defendant's travel plans).

Deputy Frye issued the warning ticket and returned Anderson's license and vehicle documentation approximately thirteen minutes after the traffic stop began. Then, through a series of questions, Deputy Frye asked if Anderson had guns, illegal drugs, or a large amount of currency in the vehicle. Anderson responded, "No," to each of these questions. Deputy Frye asked for consent to search the vehicle. Anderson denied consent. Deputy Frye asked Anderson for consent to wait until a drug-detection dog arrived. Anderson again denied consent.

Deputy Frye immediately, and within 15 minutes after the traffic stop began, called for a canine unit. Deputy Vance and his canine, Igor, arrived 36 minutes later; less than an hour after the traffic stop began. This delay while waiting for the canine unit was not an unreasonable detention in violation of the Fourth Amendment, particularly where due to surgery performed on the county's other canine officer, the only available canine

unit was off-duty and home when Deputy Frye called.  See, e.g., U.S. v. Riley, 684 F.3d 758 (8th Cir. 2012) (holding a one-hour wait for a drug dog was not unreasonable where the officer called for the canine within 11 minutes of his initial stop, the officer had reasonable suspicion that criminal activity was afoot, and the wait was unavoidable as no drug dogs were on duty in the area and an off-duty dog was called to the scene); U.S. v. Lyons, 486 F.3d 367, 372 (8th Cir. 2007) (holding a thirty-one minute wait for a drug dog's arrival at a traffic stop was not excessive); United States v. White, 42 F.3d 457, 460 (8th Cir. 1994) (finding delay of one hour and twenty minutes for arrival of drug dog reasonable).

Upon arriving at the scene, and consistent with his training, Igor was deployed to sniff the BMW.  As Igor circled the vehicle, he indicated to the odor of illegal drugs by jumping and scratching at the seam between the passenger side doors.  Although Anderson argues Igor was actually trying to reach a toy Deputy Vance was carrying, Deputy Vance credibly testified that Igor's reaction was an indication to the odor of drugs, as is fully supported by the video recording of the stop.

Anderson claims Igor's indication must be ignored because Igor was inexperienced and drug dogs, especially inexperienced ones, can make mistakes.  During extensive cross-examination, Anderson correctly pointed out that prior to the December 13, 2012 traffic stop, Igor and Deputy Vance had worked together for less than six months, and Igor had been deployed only five times.  But Deputy Vance explained, in detail, the training, testing, and blind control testing he and Igor received through a reputable certification provider.  As a canine unit, Deputy Vance and Igor completed and passed this training and testing, met accepted certification standards, and were fully certified as of August 2012.

Deputies Frye and Vance were entitled to rely on Igor's indication despite the dog's lack of field experience.  As the Supreme Court recently explained:

[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.

Florida v. Harris, 133 S.Ct. 1050, 1057 (2013).

No evidence was offered indicating Igor was unreliable, or that Deputies Frye and Vance knew or should have known Igor was an unreliable drug dog. The evidence is to the contrary. While Anderson claims Igor must be unreliable because no drugs were found in the BMW, Igor's indication cannot be interpreted as false positive. Igor is trained to respond to the odor of drugs, which may linger even when the drugs themselves are not present. "A well-trained drug-detection dog *should* alert to such odors; his response to them might appear a mistake, but in fact is not." Harris, 133 S. Ct. at 1059 (emphasis in original).

A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone (just as a police officer's much inferior nose detects the odor of marijuana for some time after a joint has been smoked). In the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found.

Harris, 133 S. Ct. at 1059, n. 2. Moreover, courts "do not evaluate probable cause in hindsight, based on what a search does or does not turn up." Harris, 133 S. Ct. at 1059.

Igor's indication to the odor of drugs within the BMW provided probable cause to search the vehicle. Harris, 133 S. Ct. at 1057-59 (when the government introduces substantial evidence of a dog's training and his proficiency in finding drugs, absent evidence that the training was insufficient or the dog unreliable, the canine's alert

provides probable cause to search a vehicle even if drugs were not found during the ensuing search).

The officers found over $25,000 in currency in the vehicle, and they seized this money. Anderson claims the officers lacked probable cause to seize the currency because no drugs, or other evidence of illegal conduct, was found in the vehicle.

The Eighth Circuit has "adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking." U.S. v. $124,700 in U.S. Currency, 458 F.3d 822, 826 (8th Cir. 2006). Providing false statements to an officer about having money in a vehicle provides reason to question the legitimacy of the currency's presence." U.S. v. $124,700 in U.S. Currency, 458 F.3d at 826. See also U.S. v. $84,615 in United States Currency, 379 F.3d 496, 501 (8th Cir. 2004) (holding that claimant's attempts to conceal the money's presence by falsely stating he could not open the trunk, combined with packaging the money to mask drug odors, was evidence that the money was connected to drug trafficking). And carrying a large amount of cash while traveling on the highway "is 'strong evidence' of a connection to drug activity." U.S. v. $124,700 in U.S. Currency, 458 F.3d at 826 (quoting $84,615 in U.S. Currency, 379 F.3d at 501-02); U.S. v. U.S. Currency, in Amount of $150,660.00, 980 F.2d 1200, 1206 (8th Cir. 1992)(holding that if currency was from a bank, the money would have been wrapped in bank money wrappers and not rubber bands).

While a canine sniff alone may not sufficiently prove that currency is related to illegal drug activity, (Muhammed v. Drug Enforcement Agency, 92 F.3d 648, 653 (8th Cir. 1996)), under the totality of circumstances presented, Igor's alert and indication supports a connection between the money and drug trafficking. U.S. v. $117,920.00 in U.S. Currency, 413 F.3d 826, 829 (8th Cir. 2005)(citing $84,615 in United States

Currency, 379 F.3d at 502); U.S. v. U.S. Currency in the Amount of $150,660.00, 980 F.2d at 1206.

Anderson lied about having a large amount of currency in the BMW; he apparently lied about staying at his father's home in Sioux Falls rather than at a motel; he was transporting, by vehicle from South Dakota to California, several denominations of currency totaling more than $20,000 and concealed under clothing in a suitcase; and a reliable canine indicated to the odor of illegal drugs in the vehicle.  Based on the totality of this information, Deputies Vance and Frye had probable cause to believe the currency was the proceeds of illegal drug trafficking.  The currency within Anderson's BMW on December 14, 2012 was lawfully seized.[3]

Anderson' Fourth Amendment rights were not violated by the stop of his vehicle, his detention, the search of his vehicle, and the seizure of cash within the vehicle on December 14, 2012.

---

[3] Anderson also claims Deputy Frye used threats to get Anderson to disclaim the money. Anderson argues:

> Deputy Frye then threatens claimant that the local prosecutor will charge him and he will go to prison unless he denies ownership of the currency and signs a release form giving the currency to the Deputy, which claimant eventually did under extreme duress and fear from threats by deputy Frye that if he didn't he would be sitting in jail over the weekend followed by many years of prison time.

(Filing No. 24, at CM/ECF p. 6).

Upon review of the video recording, there is no evidence Deputy Frye threatened Anderson.  In explaining options to Anderson, Deputy Frye was candid, professional, and honest. And there is no evidence Anderson made any inculpatory statements following his arrest and before being advised of his Miranda rights.  Finally, based on the arguments raised during the hearing, the government is not arguing that Anderson disclaimed or does not own the seized currency, rendering any claim that he was threatened to disclaim ownership irrelevant to this forfeiture action.

14

Accordingly,

IT HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, United States District Judge, that claimant's motion for summary judgment, (Filing No. 23), be denied in all respects.

The parties are notified that failure to object may be held to be a waiver of the right to appeal the district judge's adoption of the recommendation.

IT HEREBY IS ORDERED:

1)      The Pretrial Conference is scheduled to be held before the undersigned magistrate judge on **July 1, 2014** at **1:00 p.m.**, and will be conducted telephonically. Plaintiff's counsel shall initiate the call.   The parties' proposed Pretrial Conference Order and Exhibit List(s) must be emailed to zwart@ned.uscourts.gov, in either Word Perfect or Word format, by 5:00 p.m. on June 30, 2014.

2)      The jury trial of this case is set to commence before John M. Gerrard, United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on **July 15, 2014**, or as soon thereafter as the case may be called, for a duration of three (3) trial days.  This case is subject to the prior trial of criminal cases and such other civil cases as may be scheduled for trial before this one.   Jury selection will be held at the commencement of trial.

June 9, 2014.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.