IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

$25,180.00 IN UNITED STATES CURRENCY,

Defendant.

4:13CV3103

**TRIAL BRIEF**

**Facts**

On December 14, 2012, Seward County Sheriff's Office Deputy Dave Frye conducted a traffic stop on John Anderson as he was travelling westbound on Interstate 80 in Seward County, Nebraska. Deputy Frye approached the vehicle on the passenger side and made contact through an open window. John Anderson was the driver and only occupant. Deputy Frye advised Mr. Anderson the reason for the stop. He asked Mr. Anderson to come back to the patrol unit where he would issue a warning.

Deputy Frye conversed with Mr. Anderson while completing the warning and looking over Mr. Anderson's documentation. Mr. Anderson stated he was returning home to California after visiting family in Sioux Falls, South Dakota, for the past week and a half. Mr. Anderson said he was self-employed; he owned a debt settlement company where he helped people get out of debt. Mr. Anderson said he had purchased the vehicle he was driving, a BMW X5, about a month prior. Mr. Anderson said while he was in Sioux Falls, he had helped his father work on his home and visited his grandmother who had fallen ill. He stayed with family while he was in Sioux Falls and not at any hotels. Mr. Anderson said he did not know for sure what route he was going to take for his return trip.

Deputy Frye returned to the vehicle in order to compare the VIN on file with the VIN on the vehicle itself. He then returned to the patrol car and began preparing the warning.

Throughout the course of the traffic stop, based upon his training and experience, Deputy Frye became suspicious Mr. Anderson was involved in criminal activity. Deputy Frye saw an air freshener placed in the vent in front of the passenger seat and detected a strong odor of air freshener coming from within the vehicle. Deputy Frye saw a radar detector hidden behind the front passenger seat headrest. His Dispatch told him Mr. Anderson had a positive criminal history. Mr. Anderson stated he was unsure of where his travels would take him just hours away from the time of the traffic stop. Mr. Anderson purchased the vehicle one month prior, though its registration was issued four days prior to the traffic stop. During the traffic stop, Deputy Frye received a text message from Nebraska State Patrol Trooper Rob Pelster who was travelling by the traffic stop, on the opposite side of the Interstate. Trooper Pelster conveyed to Deputy Frye that, if Mr. Anderson's vehicle had California plates, then he saw that same vehicle heading eastbound on Interstate 80 the previous day. Mr. Anderson was traveling between major-source and major-destination city areas for large amounts of contraband.

Deputy Frye asked Mr. Anderson if he would be willing to speak with him further. Mr. Anderson agreed. Deputy Frye requested consent to search the vehicle. Mr. Anderson denied consent. Deputy Frye then detained Mr. Anderson and requested a drug detector canine come to the location of the stop.

Sgt. Mike Vance, with the Seward County Sheriff's Office, arrived with his drug detector canine. Sgt. Vance deployed the dog around Mr. Anderson's vehicle. The dog gave a positive indication to the odor of narcotics coming from the vehicle. During the ensuing vehicle search, deputies found three rubber-banded bundles of cash underneath some clothing in a suitcase in the

backseat. The cash totaled $25,180.00; it is the Defendant property in this case. The deputies also found a receipt for a Sioux Falls hotel, evidencing lodging the night before the traffic stop.

Deputy Frye placed Mr. Anderson in handcuffs and advised him of his *Miranda* rights. Mr. Anderson said the money was not his; it was illegal gambling proceeds he was transporting for another person. Mr. Anderson said he used to gamble. He owed the person for whom he was transporting the Defendant property $5,000.00. This trip would cancel that debt. Mr. Anderson signed an abandonment form pertaining to the $25,180.00. He and his vehicle were then released from custody.

## Issues

**Whether the United States can show, by a preponderance of the evidence, a substantial connection between the Defendant property and a controlled substance offense.**

The Defendant currency is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6): "All monies, … furnished or intended to be furnished by any person in exchange for a controlled substance …, all proceeds traceable to such an exchange, and all monies, … used or intended to be used to facilitate any violation of [controlled substances used in violation of Title 21]." "To successfully effectuate the forfeiture of seized currency under 21 U.S.C. § 881, the government must prove, by a preponderance of the evidence, that a substantial connection exists between the seized currency and drug activity. 18 U.S.C. § 983(c)." *United States v. $63,530.00 in United States Currency*, 781F.3d 949, 955 (8th Cir. 2015).

"In a forfeiture action under [21 U.S.C.] § 881, the United States bears the initial burden of establishing by a preponderance of the evidence that the property is substantially connected to drug trafficking. 18 U.S.C. § 983(c)(1) and § 983(c)(3). Circumstantial evidence can be used by the United States to establish its burden of

proof." *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir. 2004) (citation omitted). "[T]he government does not have to show evidence of, or trace the money to, a particular transaction." *United States v. U.S. Currency in the Amount of $150,660.00*, 980 F.2d 1200, 1205 (8th Cir. 1992) (citations omitted). The United States respectfully submits enough instances of circumstantial evidence will be presented to this Court to allow it to reasonably and properly conclude the Defendant currency is substantially connected to drug activity.

First, the Defendant property is a rather large sum of cash. It consisted of three rubber-banded bundles of various denominations. "Carrying a large sum of cash wrapped in rubber bands while traveling on the highway is strong evidence of a connection to drug activity." *United States v. $46,000.00 in United States Currency*, 2007 WL 1342542, *6 (D. Neb., 2007) (*quoting $84,615*, 379 F.3d at 501-502 and *United States v. $124,700 in U. S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006)). Though it is certainly not unreasonable to assume a person may conduct business transactions in cash, the amount of currency involved in this case must give one pause. "A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't, because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. … Legitimate businesses wire cash between bank accounts or they convert large sums of cash into cashier's checks. … As a matter of common knowledge and common sense, legitimate businesses do not transport this much cash by couriers. The same is not true of drug rings, which commonly utilize couriers to transport in cash

their ill-gotten gains, which can be huge." *United States v. $242,484.00,* 389 F.3d 1149, 1161 (11th Cir. 2004) (*en banc*).

Second, the Eighth Circuit has commented on rubber-banded bundles of money. In *United States v. $12,390.00*, 956 F.2d 801 (8th Cir. 1992), the Circuit affirmed the district court's conclusion the defendant currency was forfeitable to the United States because it was connected to drug activity. "The district court also found that the government had met its burden of showing probable cause to forfeit the money involved in this case. A review of the record shows that there is ample evidence to support this position. … In addition, the money seized from the residence was wrapped in rubber bands, which, according to the un-impeached testimony of a narcotics officer, is characteristic of the way drug money is stored." *Id*. at 806.

Third, the manner in which the Defendant currency was wrapped and concealed supports the theory it was either drug proceeds or was money used or intended to be used to facilitate a drug transaction. The rubber-banded bundles were found hidden under clothes in a piece of luggage.

In *United States v. $117,920.00 in United States Currency*, 413 F.3d 826 (8th Cir. 2005), the money was seized during a Nebraska State Patrol trooper's traffic stop on a vehicle driven by Mehrdad Soosan. The trooper found the money hidden beneath clothing, in a plastic sack, in a piece of luggage in the trunk of Soosan's car. *Id*. at 827. After its *de novo* review, the Eighth Circuit affirmed the district court's forfeiture of the money: "There is also evidence of concealment, and this supports a connection between the money and drug trafficking. … The money in Soosan's trunk was bundled in rubber

bands, enclosed in a plastic sack, and hidden beneath clothing in a duffel bag." *Id*. at 829.

In *$124,700*, the Eighth Circuit reviewed the Nebraska State Patrol's seizure of currency a trooper found in Emiliano Gonzalez's vehicle. "Trooper Bigsby went directly to the rear passenger side of the vehicle and opened a cooler that was in the back seat, where he found a large plastic bag that contained seven bundles wrapped in rubber bands inside aluminum foil packaging." 458 F.3d at 824. The Eighth Circuit determined, "[T]he evidence as a whole demonstrates by a preponderance of the evidence that there was a substantial connection between the currency and a drug trafficking offense. … The currency was concealed in aluminum foil inside a cooler, and while an innocent traveler might theoretically carry more than $100,000 in cash across country to conceal funds from would-be thieves on the highway, we have adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking." 458 F.3d at 826.

Another piece of circumstantial evidence upon which this Court may rely to support a finding of forfeitability was a drug dog indicated to the Defendant currency. Irrespective of those Circuits which express a different point of view, the Eighth Circuit continues to assert a positive drug dog reaction is one of the factors this Court may consider in determining whether the Defendant property is substantially connected to drug trafficking. "Although this court has recognized the potential limitations of a drug dog's alert by characterizing it as 'some—*albeit* slight—indication' of drug activity, we

still recognize that an alert carries weight in considering whether a substantial connection exists." *$63,530.00*, 781 F.3d at 956.

The United States recognizes, however, at least one Eighth Circuit judge is dissatisfied with this line of reasoning. In *Muhammed v. Drug Enforcement Agency*, 92 F.3d 648 (8th Cir. 1996), Senior Judge C. Arlen Beam, writing for the Court, stated, "The government further refers to the drug dog's alert to the cash. However, it is well established that an extremely high percentage of all cash in circulation in America today is contaminated with drug residue. . . . The fact of contamination, alone, is virtually meaningless, and gives no hint of when or how the cash became so contaminated." *Id*. at 653.

The United States respectfully submits the *Muhammed* decision is not controlling in this Circuit, because Judge Beam's statements were *dicta*; they were not based on evidence submitted to the district court. Moreover, the Eighth Circuit's recently addressed this argument, stating, "[T]his argument is unpersuasive." *$63,530.00*, 781 F.3d at 956.

An "other suspicious circumstance" was Mr. Anderson's stated purpose for his travel. He had been in Sioux Falls for the prior week and a half, visiting with family, and staying with family, not in hotels. Yet, Trooper Pelster saw Mr. Anderson's vehicle the day before, travelling along Interstate 80 in the opposite direction. And, the United States expects Darin McDonnel will testify he rented a hotel room in Sioux Falls for John Anderson for the night before the traffic stop, and did so at Mr. Anderson's request.

Finally, another suspicious circumstance is Mr. Anderson was not truthful with Deputy Frye. He repeatedly denied the money was in the vehicle. In *$117,920.00*, the

fact Mehrdad Soosan lied about not having $117,920.00 in his vehicle was significant to the Eighth Circuit and tended toward the money's forfeitability. 413 F.3d at 829. In *$124,700*, Emiliano Gonzalez's lie to the trooper about not having $127,700.00 in his vehicle was also significant to the Circuit: "Then, when Gonzalez was questioned by officers, he lied about having money in the car and about the names of his friends, thus giving further reason to question the legitimacy of the currency's presence." 458 F.3d at 826. In *$63,530.00,* the claimant's dishonest answer to the deputy about possessing large amounts of currency was a factor upon which the Circuit relied in finding a substantial connection between the money and drug trafficking. 781 F.3d at 955-956.

**Whether evidence seized from Mr. Anderson's vehicle must be suppressed because the drug detection dog's behavior did not provide probable cause for the search.**

The United States assumes Mr. Anderson makes this argument because he submits Sgt. Vance's drug detector dog did not indicate to an odor of a controlled substance coming from the vehicle; rather, the dog indicated because it was "cue-ed" by Sgt. Vance. The United States also assumes Mr. Anderson will offer the testimony of Andy Falco-Jimenez to support this argument. The United States intends to offer the testimonies of Sgt. Vance and Mike West to counter this argument. The United States respectfully reserves the right to argue this issue upon the conclusion of the trial testimony.

**Whether evidence seized from Mr. Anderson's vehicle must be suppressed because the arresting officer violated Mr. Anderson's Fourth Amendment rights by detaining him until the K-9 officer arrived to conduct a drug dog detection search.**

On April 21, 2015, the Supreme Court overruled Eighth Circuit precedent in *Rodriguez v. United States*, No. 13-9972. The Supreme Court held, "We hold that a

police stop exceeding the time needed to handle the matter for which the stop was made violated the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." No. 13-9972, p.1 (*citing Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

The *Rodriguez* Court stated, "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop[;] he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." No. 13-9972, p. 6. The *Rodriquez* Court did not overrule, therefore, the Eighth Circuit precedent upon which this Court relied to address whether reasonable suspicion existed to justify detaining Mr. Anderson once the traffic stop was concluded.

> An officer may lawfully "expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." *U.S. v. Chavez Loya*, 528 F.3d 546 (8th Cir. 2008). "To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *U.S. v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010) (citing *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010)). "Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances," (*Bracamontes*, 614 F.3d at 816), and "any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity." *United States v. Jones*, 269 F.3d 919, 926-27 (8th Cir. 2001).

(Filing No. 56, p. 8).

By adopting (at Filing No. 68) the Magistrate Judge's Findings, Recommendation, and Order (Filing No. 56), this Court has already found reasonable

suspicion existed to detain Mr. Anderson following the completion of the traffic stop. It did so based on the following factors:

> Deputy Frye's suspicion of criminal activity began before the BMW was fully stopped. Trooper Pelster, while passing on the eastbound lanes, recognized the vehicle. He sent a text to Deputy Frye stating that if the vehicle had California plates, it was travelling east on the interstate the day before. Deputy Frye read this text message before he approached the parked BMW and, upon request, received Anderson's driver's license and the vehicle registration. From this documentation, Deputy Frye discovered the vehicle was registered in, and Anderson was from, California. Deputy Frye asked about the purpose of Anderson's trip, and Anderson stated he had visited family in South Dakota.
>
> Since the BMW was seen in Nebraska only one day earlier by Trooper Pelster, Anderson's explanation of the trip could be true only if Anderson had driven (and was now returning) the distance from Southern California to Southeastern South Dakota for a family visit which lasted less than a full day. Anderson's trip explanation, considered in the context of all the facts presented, defied common sense: It was highly likely Anderson was purposefully concealing the true purpose of his trip. Deputy Frye had ample reason to suspect Anderson may be engaged in criminal activity, and the officer was entitled to ask additional, more probing questions during the traffic stop to either confirm or dispel his suspicion.
>
> As it turned out, Anderson's further responses confirmed Deputy Frye's suspicions. When asked about the South Dakota trip, Anderson stated he was in the Sioux Falls area visiting family for a week or a week and a half—which contradicted Trooper Pelster's memory of the vehicle being in Nebraska the previous day. Anderson claimed he could not remember what day or date he left from California, nor what time he had left Sioux Falls that day to return to California.
>
> The vehicle registration provided the most persuasive evidence that Anderson was lying to Deputy Frye. Approximately twelve minutes after the stop was initiated, as Deputy Frye was preparing to hand Anderson a completed warning ticket and return his driver's license and vehicle documents, the officer noticed that according to the vehicle registration, Anderson paid his vehicle taxes and registered the vehicle in California on December 10, 2012—only four days prior to the stop. The vehicle registration wholly contradicted Anderson's statement that he was in South Dakota for the past week, while simultaneously supporting Trooper Pelster's memory of seeing the same BMW travelling eastbound in Nebraska on December 13, 2012. Based on the totality of the information presented, Deputy Frye ha[d] reasonable suspicion to further detain Anderson following the completion of the traffic stop based on the officer's reasonable suspicion that criminal activity was afoot. *U.S. v. Suitt*, 569 F.3d 867 (8th Cir. 2009) (holding the officer did not violate the Fourth Amendment by asking a

defendant more questions after termination of traffic stop and conducting a dog sniff of defendant's vehicle, where the defendant repeatedly gave hesitant, evasive, incomplete, and implausible answers to the officer's questions about defendant's travel plans).

(Filing No. 56, pp. 8-10).

**Whether the Claimant is an Innocent Owner of the Defendant Property, Within the Purview of 18 U.S.C. § 983(d).**

While 21, U.S.C. **§** 881(a)(6) provides for the forfeiture of proceeds traceable to the exchange of a controlled substance, that Section also contains an exception to forfeitability: "[N]o property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of an act or omission established by the owner to have been committed or omitted without the knowledge or consent of that owner." This is commonly referred to as the "innocent owner" defense. It is now codified at 18 U.S.C. § 983(d)(1): "An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." Section 983(d)(2)(A) further defines innocent owner: "With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term 'innocent owner' means an owner who (i) did not know of the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstance to terminate such use of the property." Mr. Anderson can not meet this burden.

Mr. Anderson certainly knew of the conduct giving rise to the forfeitability of the Defendant property—he painstakingly segregated the money into three, separate, rubber-banded bundles. Then he took those three bundles and hid them under clothes in his luggage. It strains credulity to believe Mr. Anderson would treat such a large amount of legitimate income in such a manner, especially after travelling over halfway across the country to generate such income.

The United States respectfully submits this Court should find Mr. Anderson's statements to Deputy Frye about his travel itinerary, his purported justification for traveling to the Sioux Falls area to visit family, his repeated and varying reasons for lying to Deputy Frye about the money's presence in the vehicle, and the testimony he offers to support the source of the Defendant property and his amassing thereof, are self-serving and simply nonsensical. Mr. Anderson's statements are "inherently incredible, and [this Court is] well within its rights in not believing [them]." *$12,390.00*, 956 F.2d at 806. By the greater weight of the evidence, Mr. Anderson is not an innocent owner of the Defendant property.

**Conclusion**

For the reasons stated herein, the United States respectfully requests this Court forfeit the Defendant property to the United States.

UNITED STATES OF AMERICA,
Plaintiff

DEBORAH R. GILG
United States Attorney

By: *s/Nancy A. Svoboda*
Nancy A. Svoboda (#17429)
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, Nebraska 68102-1506
Telephone (402) 661-3700
E-mail: nancy.svoboda@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify on April 27, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following: Mr. Jonathan J. Papik

*s/Nancy A. Svoboda*
Nancy A. Svoboda
Assistant U.S. Attorney