UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:13-cv-3103 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | TRIAL BRIEF OF CLAIMANT JOHN |
| $25,180.00 IN UNITED STATES | ) | ANDERSON |
| CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

Claimant John Anderson respectfully submits this Trial Brief.

## I.   **INTRODUCTION**

In this matter, the Government seeks forfeiture of $25,180.00 in United States currency seized from Mr. Anderson's vehicle in a traffic stop on December 14, 2012.  The Government cannot, however, carry its burden to show that the currency is "property substantially connected to drug trafficking," as it must to prevail.  Furthermore, the evidence introduced at trial will show that the officers conducting the traffic stop violated Mr. Anderson's Fourth Amendment rights and thus the currency as well as any other evidence located during the search of Mr. Anderson's vehicle must be suppressed under the exclusionary rule.  Accordingly, Mr. Anderson will be entitled to judgment in his favor and an order directing the Government to return his property.

## II.   **STATEMENT OF FACTS**

The evidence adduced at trial will establish the following facts:

## A. __Background on Mr. Anderson's and his planned silver purchase.__

Mr. Anderson currently resides in San Clemente, California.  He moved to California from Sioux Falls, South Dakota in 1990.  He grew up in Sioux Falls and his father and grandmother still live in the area.

Mr. Anderson has an interest in collecting, buying, and selling coins and other metals.  In 2011, he met an acquaintance of his father's from Sioux Falls, David Kadinger, who was also interested in coins and metals.  Mr. Anderson informed Mr. Kadinger that if the opportunity arose for Mr. Anderson to buy silver in the future, he would be interested.  In the fall of 2012, Mr. Anderson contacted Mr. Kadinger and was told that some silver would be available for purchase before the end of the year.  Mr. Anderson indicated he was interested in making such a purchase.

Because he felt that the silver could be obtained at a good price, Mr. Anderson began to assemble funds that could be used to purchase as much as silver as possible.   In November 2012, he sold his vehicle for $8,300.00.  [Exhibits 104-105.]  He purchased another vehicle for $15,000.00, but made the purchase by way of a $25,000.00 loan and obtained the balance of the loan proceeds in cash.  [Exhibits 101-103.]  Mr. Anderson's mother also agreed to loan him $5,000.00 she had won gambling in Las Vegas to go toward the planned purchase of silver.

Mr. Anderson had other funds available at that time as well.  In addition to the vehicle sales and purchases and the loan from his mother, Mr. Anderson was paid just over $9,000.00 in cash for work performed for a contractor in

2012 and had sold a Harley-Davidson motorcycle the previous year for $7,500. [Exhibits 106-108.]   Mr. Anderson also owned and operated a company that assisted customers with resolving credit card debt.

Mr. Anderson routinely keeps a significant amount of funds in the form of cash.   He stores the cash in a safe in his home.   From the various transactions described above and the accumulation of cash over time, Mr. Anderson was able to gather together over $25,000.00 in cash.   He planned to take the cash to Sioux Falls so that he could purchase the silver.

**B. Mr. Anderson's trip to Sioux Falls.**

On approximately December 10 or 11, 2012, Mr. Anderson departed southern California for Sioux Falls in the vehicle he had recently purchased. Two days later he arrived in Sioux Falls, only to be informed that the silver bullion he had indicated he wanted to buy was not available.   Upset that the purchase had fallen through, Mr. Anderson made plans to return to California the following day.

**C. The traffic stop in Nebraska**

Mr. Anderson began his return trip to California on December 14, 2012. As he was driving through Nebraska, he noticed that a marked law enforcement car had pulled along beside him and the officer appeared to be looking into his car.   The marked car then pulled behind Mr. Anderson and engaged his lights, signaling for Mr. Anderson to pull over.   Mr. Anderson pulled over into a rest area near Goehner, Nebraska.

The officer was Deputy David Frye of the Seward County Sheriff's Department.   Deputy Frye informed Mr. Anderson that he had failed to properly signal a lane change and asked Mr. Anderson to come sit in the front seat of the squad car.   Mr. Anderson did so.   Deputy Frye told him that he would just be issuing a warning ticket, but began asking Mr. Anderson a number of questions about where he was going, where he had come from, and the purposes of his travels.

During the course of his conversation with Deputy Frye, Mr. Anderson said some things that were not true.   He indicated that he had been in Sioux Falls for longer than just one night, that he had been visiting family there, and denied having a significant amount of cash in his car.   Mr. Anderson made these statements because, at the time, he was tired and upset about how his trip had turned out and he did not think the reasons for his travels were anyone else's business.   Mr. Anderson was also concerned that acknowledging the cash and his short trip would only lead to more questions and he just wanted to get home.

Between his questions of Mr. Anderson, it took Deputy Frye over 10 minutes to complete the paperwork to give Mr. Anderson a warning for failure to properly signal a lane change.   At that point, he asked Mr. Anderson if he could search the car.   Mr. Anderson denied consent.   Deputy Frye then indicated he was going to call for a drug dog to conduct a search on Mr. Anderson's vehicle.

Mr. Anderson and Deputy Frye waited in Deputy Frye's squad car for approximately 36 minutes before the canine officer, Sergeant Mike Vance of the Seward County Sheriff's Department, and his dog, Igor, arrived on the scene. This was only the sixth time that Igor had been used in the field.  [Vance Depo 47:2-50:12.]   At that point, Deputy Frye got out of the car and informed Sergeant Vance that Deputy Frye believed that there was contraband in Mr. Anderson's vehicle.  [Vance Depo 21:1-22:25; Exhibit 1 at 50:52.]  A scientific study has demonstrated that a dog handler's belief that contraband is present makes it more likely that the dog will perform the behavior he has been taught to indicate the presence of narcotics.  [Exhibit 111.]

Sergeant Vance then took Igor around Mr. Anderson's vehicle.  Sergeant Vance began by moving Igor from the front of the vehicle on the driver's side in a counter-clockwise fashion.  [Exhibit 1 at 54:20-54:30.]  Sergeant Vance kept Igor on a tight leash and stayed in close proximity to him.  [Id.]  When Sergeant Vance and Igor reached the passenger side of the car, Sergeant Vance stopped his backward movement before Igor had changed his behavior.  [Id. at 54:31.]  Seconds later, Sergeant Vance pulled upon on the already tight leash and Igor jumped up and becomes even more visibly excited.  [Id. at 54:34.]  Sergeant Vance then moved his hand above his shoulder to where Igor's toy is kept and Igor again reacted with excitement.  [Id. at 54:36.]  Officer Vance then rewarded Igor by giving him his toy.  [Vance Depo 29:3-31:2; Exhibit 1 at 54:42.] According to Sergeant Vance, it his is practice to reward Igor as soon as he

indicates. [Vance Depo 29:3-31:2.] Sergeant Vance concluded that Igor had indicated the presence of the odor of narcotics in the vehicle.

Sergeant Vance and Deputy Frye then began searching Mr. Anderson's vehicle. They located the cash Mr. Anderson had brought for the planned silver purchase in his suitcase on the backseat behind the driver's seat. [Frye Depo 42:2-42:4; Vance Depo 36:19-37:1.] After extensive searching, they did not locate any drugs, weapons, or anything illegal. [Frye Depo 43:24-44:19]. Despite finding Mr. Anderson's cell phone, they did not find any texts that suggested Mr. Anderson was engaged in drug trafficking. [Frye Depo 50:18-51:16.]

In Deputy Frye's career, he has encountered motorists who are transporting large amounts of cash that are not tied to some illegal activity. [Frye Depo 59:19-60:6.] In his view, traveling with $30,000 to $40,000 worth of cash is not, by itself, indicative of drug trafficking. [Frye Depo 62:9-63:18.] Among those travelers Officer Frye has encountered who are traveling with large amounts of legitimate cash, some have stored it in luggage and others have stored it inside a console. [Frye Depo 63:19-64:12.]

**D. Mr. Anderson's arrest.**

Deputy Frye informed Mr. Anderson he was being placed under arrest. He was handcuffed and Deputy Frye drove him to the Seward County Sheriff's Office. Mr. Anderson's vehicle was towed to the same office. The Government will likely contend that in Mr. Anderson's conversation with Deputy Frye on the way to the Seward County Sheriff's Office, he made admissions that support

6

forfeiture in this case.  Mr. Anderson did not, however, ever admit to any role in drug trafficking in any of his conversations with Deputy Frye.

Mr. Anderson was permitted to leave later that day after he signed a form abandoning his currency.  Mr. Anderson was not charged with a criminal offense.

### E. The seized currency was never tested for narcotics.

Although Officer Frye informed Mr. Anderson during the course of the traffic stop that the currency would be tested to see if it was drug currency, no testing was ever performed on the seized cash.  [Frye Depo. 49:1-8; 54:12-55:7.]  Instead, the cash was sent to a bank in Seward where it was converted into a cashier's check that was sent to the Government.  [Frye Depo 53:22-54:7.]  It would not be possible to locate the actual bills found in Mr. Anderson's vehicle today.  [Frye Depo 54:8-54:11.]

According to Sergeant Vance, it is a common practice to perform a "discretionary search" when cash is seized to verify whether the cash is narcotics-related.  To perform a discretionary search, the cash is hidden in an area and the drug dog is brought in to see if he locates the hidden cash. Sergeant Vance thinks the reason a discretionary search was not conducted in this case is probably because it was his day off and he wanted to get home. [Vance Depo 43:16-44:19.]

### III.   ARGUMENT

Mr. Anderson is entitled to the return of his property.  As explained in more detail below, the Government cannot carry its burden of proof to show

7

that the property is subject to forfeiture and, in any event, the cash and all evidence seized from Mr. Anderson's vehicle must be suppressed as the search violated Mr. Anderson's Fourth Amendment rights.

A. **The Government cannot show that the property is "substantially connected to drug trafficking."**

After the passage of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), in order to prevail in a forfeiture action, the Government must establish by a preponderance of the evidence that property is subject to forfeiture. U.S. v. Real Property Located at 3214 Washington Ave. North, 480 F.3d 841, 843 (2007) (citing 18 U.S.C. § 983(c)(1)). "Forfeitures are not favored; they should be enforced only when within both the letter and the spirit of the law." U.S. v. $48,100.00 in U.S. Currency, 756 F.3d 650 (8th Cir. 2014).

In this case, the Government contends that the currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6). To establish that property is subject to forfeiture pursuant to Section 881(a)(6), the Government must show that the "property is substantially connected to drug trafficking."[1] See U.S. v. $84,615 in U.S. Currency, 379 F.3d 496, 501 (8th Cir. 2004).

---

[1] Section 881(a)(6) provides for the forfeiture of:

> [a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

8

In this case, the officers did not find any drugs on Mr. Anderson's person or in his vehicle. Neither did they find any communications in which Mr. Anderson discussed a drug transaction. The currency seized was not tested and was returned to circulation.

Unable to point to any direct evidence of drug trafficking, the Government will attempt to carry its burden with circumstantial evidence. In particular, the Government is expected to rely on the following: that Mr. Anderson was not truthful with Deputy Frye about the currency in his vehicle or the exact details of his travels, that Mr. Anderson was traveling from California to Sioux Falls, that the drug dog indicated on the side of Mr. Anderson's vehicle, and that officers found just over $25,000.00 in cash under some clothing in a suitcase in Mr. Anderson's backseat. (Filing No. 56 at 13-14). As explained below, however, all of the Government's evidence taken together cannot establish a substantial connection between the seized currency and drug trafficking.

### 1. **Lies to a law enforcement officer are not evidence of a substantial connection to drug trafficking.**

Although Mr. Anderson was not entirely truthful with Deputy Frye, that is of little to no consequence in the forfeiture analysis. As the Eighth Circuit's recent opinion in U.S. v. $48,100.00 in U.S. Currency, 756 F.3d 650 (8th Cir. 2014) establishes, untrue statements to law enforcement officers such as those attributed to Mr. Anderson are not indicative of a substantial connection between seized currency and drug trafficking.

In $48,100.00, the claimant was pulled over in Nebraska while driving an RV from Colorado to Wisconsin.  During the stop, the officer became suspicious and began to ask the claimant questions.  The claimant denied having drugs in the vehicle, denied having a criminal history, and indicated that he had initially driven the RV to Colorado to snowboard with friends.  Each of these statements was a lie; the claimant had marijuana in the RV, he had previously been charged with a drug crime and he had actually driven to Colorado with the intention to live there permanently.  The government argued that claimant's lies to the officer constituted evidence of a substantial connection to drug trafficking.  The Eighth Circuit disagreed.  In doing so, it explained that, in the absence of evidence of a particular drug transaction, the claimant's lies did not weigh in favor of a finding of drug trafficking.  As the Court noted,

> [Claimant] could have been traveling for any reason he would not want to share with law enforcement, e.g., drug trafficking, guns, stalking, stolen goods, or any of a number of unlawful or embarrassing activities.  Finding his proffered reason for travel not credible means any other reason is possible.  In the absence of any affirmative evidence suggesting it was for drug trafficking, the court would have to speculate to find the drug trafficking explanation more likely than any other.

Id.[2]

In this case, just as in $48,100.00, the Government introduced no evidence of a particular drug transaction in which it contends Mr. Anderson was involved.   Instead, the Government seeks forfeiture based on

---

[2] See also U.S. v. 10,700.00 in U.S. Currency, 258 F.3d 215, 227 (3d Cir. 2001) (explaining that suspicions of general criminality are not sufficient to show that money is substantially connected to drug trafficking); United States v. $5,000.00 in U.S. Currency, 40 F.3d 846, 850 (6th Cir. 1994) (same) U.S. v. U.S. Currency, $30,060.00, 39 F.3d 1039, 1044 (9th Cir. 1994) (same).

circumstantial evidence of an unspecified drug transaction.   In such circumstances, Mr. Anderson's statements to the officer – even if not truthful – are not evidence of a substantial connection to drug trafficking under $48,100.00.

## 2. **The drug dog's behavior is not indicative of a substantial connection to drug trafficking.**

The drug dog's behavior near Mr. Anderson's vehicle is also not evidence of a substantial connection to drug trafficking.  As an initial matter, a line of Eighth Circuit cases have held that an indication by a drug dog is, standing alone, insufficient to prove that currency is related to drug activity and is, at the most, only "slight" evidence of a possible connection with drug trafficking. See, e.g., U.S. v. $124,700 in U.S. Currency, 458 F.3d 822, 826 & n.1; U.S. v. $84,615.00 in U.S. Currency, 379 F.3d 496, 502 (8th Cir. 2004); Muhammed v. Drug Enforcement Agency, 92 F.3d 648, 653 (8th Cir. 1996).

While the Eighth Circuit has directed courts to accord little weight to dog indications, several facts unique to this case should further diminish the probative nature of any dog indication.  First, the government will not introduce any scientific or statistical evidence as to the correlation between an indication by the dog used to sniff Mr. Anderson's vehicle and a connection between the seized currency and drug trafficking.  In a previous case, this Court found the absence of scientific or statistical evidence pertaining to dog alerts as grounds for deeming the dog's indication "inconsequential."  U.S v. $1,074,900.00 in U.S. Currency, 932 F. Supp. 2d 1053, 1063 (D. Neb. 2013); see also $124,700, 458 F.3d at 826 & n.1 (pointing to lack of scientific evidence

11

as to significance of canine sniff as reason for minimizing weight afforded to same).

Second, the government cannot point to any evidence that the seized currency or Mr. Anderson's vehicle was later tested and found to have the odor of narcotics present. In $1,074,900.00, 932 F. Supp. 2d at 1062-63, this Court was troubled by the Government's failure to test currency seized after a dog sniff and relied upon this fact as another basis for its conclusion that the positive sniff was "inconsequential". See also U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars, 730 F.3d 711, 720 & n. 9 (7th Cir. 2013) ("By failing to perform such testing (and failing to preserve the Funds until conclusion of this proceeding), the government eliminated laboratory testing as a source of evidence."); U.S. v. Daniels, 2009 WL 1565873, at *4 (E.D. La. June 2, 2009) (according little weight to drug dog alert because government did not supplement the alert with a laboratory test or supply information regarding the accuracy of the alert). The Government followed the same course here and therefore the dog's sniff is entitled to even less weight than in the ordinary case.

In addition, Mr. Anderson will introduce expert testimony (via video deposition) from Andy Falco-Jimenez, a former canine officer and current trainer of drug detection dogs. It is the opinion of Mr. Falco-Jimenez that the way this dog search was conducted renders it unreliable as evidence of the presence of narcotics. In particular, Mr. Falco-Jimenez will testify that it is his expert opinion that Sergeant Vance, after being informed by Deputy Frye of the

12

belief that contraband was present, consciously or unconsciously cued Igor into indicating on Mr. Anderson's vehicle by his motion around the vehicle. Mr. Falco-Jimenez will also testify that as a result of Sergeant Vance's practice of rewarding Igor in the field whenever he indicates, it cannot be known whether Igor is indicating to the presence of narcotics or to a substance he has previously detected and for which he has received an award. For these reasons, it is the opinion of Mr. Falco-Jimenez that Igor's behavior does not reliably indicate that the scent of narcotics was present in Mr. Anderson's vehicle.

Under Eighth Circuit law, even the best drug dog indications are only slight evidence of a connection to drug trafficking. For all the reasons set forth above, Igor's behavior in this case is no evidence of a connection to drug trafficking.

### 3. **The fact that officers found $25,100.00 in currency under some clothes in a suitcase in Mr. Anderson's backseat does not establish a substantial connection to drug trafficking.**

The discovery of the currency in Mr. Anderson's vehicle is also of little help to the Government in establishing a substantial connection to drug trafficking. Although the Eighth Circuit has previously held that "bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking." $124,700.00, 458 F.3d at 826, the discovery of $25,100.00 in Mr. Anderson's suitcase, does not establish such a connection for multiple reasons explained below.

First, the amount of currency discovered in this case is not a sufficiently "large amount" to be indicative of a substantial connection to drug trafficking. A number of courts have found that currency of approximately this amount does not raise more than a suspicion of illegal activity, let alone a substantial connection to drug trafficking.  See, e.g., U.S. v. 99,990.00 in U.S. Currency, 69 Fed. Appx. 757 (6th Cir. 2003) ("[F]ifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity"); United States v. $191,910.00 in U.S. Currency, 16 F.3d 1051, 1072 (9th Cir. 1994) (same); U.S. v. Twenty One Thousand Dollars in U.S. Postal Money Orders, 298 F. Supp. 2d 597, 603 (E.D. Mich. 2003) (holding that $21,785 does not by itself "justify more than a suspicion of illegal activity"); U.S. v. One Lot of U.S. Currency Totalling $14,665, 33 F. Supp. 2d 47, 53 (D. Mass. 1998).

The Eighth Circuit has generally found the mere existence of cash in a vehicle to be evidence of drug trafficking only when amounts larger than that seized here are found.  See, e.g., $124,700.00, 458 F.3d at 826; U.S. v. $117,920.00 in U.S. Currency, 413 F.3d 826, 829 (8th Cir. 2005).  Consistent with that view, a judge on this Court recently held that the possession of almost $10,000.00 in cash was not sufficiently large to be evidence of a connection to drug trafficking.  U.S. v. 9,230.00 in U.S. Currency, --- F. Supp. 3d ---, 2014 WL 4956238, at *3 (D. Neb. Oct. 1, 2014).[3]

---

[3] It appears that the smallest amount of money the Eighth Circuit has ever found to be evidence of a connection to drug trafficking was just under $40,000.00.  See U.S. v. $39,873.00, 80 F.3d 317, 319 (8th Cir. 1996).  In any event, that case was decided in 1996 –

Moreover, the Eighth Circuit and this Court have, in recent cases, found the mere existence of a particular sum of cash irrelevant. See, e.g., $48,100.00, 756 F.3d at 654; $1,074,900.00, 932 F. Supp. 2d at 1064 ("Lots of money is not a sufficient basis in and of itself generally for forfeiture."). Not only was the amount of cash seized not found to be evidence of a connection drug trafficking in $48,100.00, the reasoning of the Eighth Circuit's decision in that case in inconsistent with the mere existence of cash – even a lot of cash – from ever being evidence of a connection to drug trafficking.

As alluded to above, in $48,100.00, the Eighth Circuit refused to accord weight to the claimant's lies to the officer, explaining that the lies could be indicative of any number of unlawful or embarrassing activities, but were not specifically indicative of drug trafficking. If lies to an officer are not evidence of a connection to drug trafficking because they might have been made for some other purpose, it follows that possession of large amounts of cash – which, in itself, is not illegal or even wrongful – cannot establish a connection to drug trafficking. See U.S. v. U.S. Currency, $30,060.00, 39 F.3d 1039, 1044 (9th Cir. 1994) (explaining that claimant found with large amounts of cash "could just as easily have been a distributor of 'street money' in a political campaign, an embezzler, a jewel smuggler, an art thief, or an S & L crook as a drug conspirator"); U.S. v. $31,990.00 in U.S. Currency, 982 F.2d 851, 854 (2d Cir. 1993) rev'd on other grounds in U.S. v. Daccarett, 6 F.3d 37 (2d Cir. 1993) ("The possession of large amounts of cash is no more indicative of drug sales

---

eighteen years ago. Factoring in inflation, nearly $40,000.00 in 1996 is a significantly larger amount than just over $25,000.00 in 2012.

than it is of weapon sales, gambling, or a myriad of other illegal activities.  At best, the presence of a large amount of cash in the cab supports an inference of illegal activity but does not suggest that the seized currency was tied to the exchange of a controlled substance.").

Finally, the fact that the cash was found in a suitcase in the backseat of Mr. Anderson's vehicle cannot establish a connection to drug trafficking.  While the Government may contend the cash was "concealed", the inside of a suitcase filled with clothes is far from an elaborate hiding place.  Officer Frye has conceded that he has previously encountered motorists traveling with legitimate currency who kept the cash in luggage.  Furthermore, decisions from the Eighth Circuit support the notion that storing cash in a suitcase is not evidence of drug trafficking.  See, e.g., $124,700, 458 F.3d at 826 ("[A]n innocent traveler might theoretically carry more than $100,000 in cash across country and seek to conceal funds from would-be thieves on the highway."); U.S. v. $141,770.00 in U.S. Currency, 157 F.3d 600, 604 (8th Cir. 1998) (explaining that claimant could reasonably argue that cash was not connected to drug trafficking if it was concealed above the ceiling as opposed to concealed above ceiling in three layers of zip-lock bags).  Unless the Government could somehow show that drug traffickers are more likely than innocent travelers to store cash in a suitcase while traveling, it is illogical to find that the cash in Mr. Anderson's suitcase supports a connection to drug trafficking.

For all these reasons, the amount of money and its location is not evidence of a substantial connection to drug trafficking.

16

**4. The fact that Mr. Anderson traveled from California to Sioux Falls is not evidence of a substantial connection to drug trafficking.**

Deputy Frye testified in his deposition that he believes the fact that Mr. Anderson was traveling from California to Sioux Falls is also evidence that he was involved in drug trafficking. The Eighth Circuit, however, has held that travel from a specific state cannot even establish reasonable suspicion of drug trafficking. See U.S. v. Beck, 140 F.3d 1129, 1137-38 (8th Cir. 1998) (rejecting Government's argument that Defendant's travel from California, allegedly a drug "source state", established reasonable suspicion).

**5. The officers did not find items typically involved in drug trafficking.**

In addition to what the officers found in Mr. Anderson's vehicle, what they did not find is also relevant to whether the Government can show a substantial connection to drug trafficking. The officers seized cash from Mr. Anderson's vehicle. They did not find drugs. There is no evidence a firearm or other weapon was found. There is no evidence that the officers found evidence of texts or voicemails regarding drug transactions. The absence of such evidence is important. In $48,100.00, the Court found the absence of communications regarding drug trafficking and a firearm as a key fact in reversing this Court's order of forfeiture. 756 F.3d at 655.

**6. The totality of the evidence cannot establish a substantial connection to drug trafficking.**

For all the reasons discussed above, any of the facts the Government could rely on to attempt to establish a substantial connection to drug trafficking do not in fact do so. This is demonstrated by $48,100.00. In

17

$48,100.00, the claimant lied to the officer about the reasons for his travel, his criminal history, and what he had in the vehicle.  The claimant had nearly twice the currency that was seized from Mr. Anderson and carried it in a plastic bag inside his backpack.  Id. at 654.  And while a drug dog did not indicate on the claimant's vehicle in $48,100.00, an even stronger connection to drugs was found:  marijuana was actually found in the claimant's vehicle. Id.  Despite all of these facts, the Eighth Circuit reversed this Court's order of forfeiture, finding that the facts did not justify forfeiture as a matter of law.

In this case, the Government relies on many of the same types of facts it relied upon in $48,100.00.  Even if all of these facts are assumed to be true, however, they cannot, even in their totality, establish a substantial connection to drug trafficking as a matter of law.  See also U.S. v. $5,000.00 in U.S. Currency, 40 F.3d 846, 849-50 (6th Cir. 1994) (holding that drug dog alert, lies to officers, previous drug convictions, and nearly $15,000.00 in cash being carried by two travel companions did not justify forfeiture); $1,074,900.00, 932 F. Supp. 2d at 1063-64 (finding drug dog alert and over one million dollars in cash "failed to show a substantial connection between drugs and the money").  Even if Mr. Anderson lied to Deputy Fyre, that fact is irrelevant after $48,100.00.  Drug dog alerts are only slight evidence, at most, and there are specific reasons why this dog's sniff is not even entitled to slight weight.  Finally, the amount and location of the seized cash cannot support a connection to drug trafficking.  Just as in $48,100.00, the Government cannot establish a substantial connection to drug trafficking.

18

**B. The cash and evidence seized during the search of Mr. Anderson's vehicle is subject to suppression.**

For reasons explained above, the Government cannot carry its burden to show a substantial connection to drug trafficking.  This is the case even if the Court considers all of the evidence relied upon by the Government.  It is also obviously the case if the Government cannot rely on the cash and evidence seized during the search of Mr. Anderson's vehicle.  In fact, the Government cannot rely on this evidence because its search of Mr. Anderson's vehicle violated the Fourth Amendment.

In Florida v. Harris, 133 S. Ct. 1050 (2013), the United States Supreme Court recognized that while an indication by a reliable drug dog on the outside of a vehicle generally provides probable cause to search, a defendant must have the opportunity to challenge the reliability of a drug dog's indication.  In particular, the Court recognized that "circumstances surrounding a particular alert may undermine the case for probable cause – if say, the officer cued the dog (consciously or not)." Id. at 1058.

In this case, the expected testimony of Andy Falco-Jimenez, summarized above, will demonstrate that the circumstances surrounding Igor's behavior preclude a finding that the drug dog search provided probable cause to search Mr. Anderson's vehicle.  In the absence of probable cause, the search violated Mr. Anderson's Fourth Amendment rights and all fruits of that search must be suppressed.  See United States v. 45,000.00 in United States Currency, 749 F.3d 709, 713-14 (8th Cir. 2014) ("Because forfeiture proceedings are quasi-

19

criminal in character, the exclusionary rule applies barring evidence obtained in violation of the Fourth Amendment.")

### C. **Mr. Anderson is an Innocent Owner of the Defendant Property for purposes of 21 U.S.C. § 983(d)**

Not only can the Government not establish a substantial connection to drug trafficking, Mr. Anderson is entitled to return of his property because he is an innocent owner of the property.  An innocent owner is an owner who "(i) did not know of the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstance to terminate use of the property."  21 U.S.C. § 983(d)(2)(A).   Because Mr. Anderson will demonstrate that there was no conduct permitting forfeiture, he, by definition, could not have known of such conduct.   Accordingly, he is an "innocent owner" for purposes of 21 U.S.C. § 983(d).

### IV.   **CONCLUSION**

For the foregoing reasons, judgment should be entered in Mr. Anderson's favor and an order should be entered directing that his property be returned to him.

JOHN ANDERSON, Claimant

s/Jonathan J. Papik
Jonathan J. Papik, #24473
    CLINE WILLIAMS
WRIGHT JOHNSON & OLDFATHER, L.L.P.
One Pacific Place
1125 S. 103rd Street, Suite 600
Omaha, NE  68124
jpapik@clinewilliams.com
Telephone: (402) 397-1700
Facsimile:  (402) 397-1806

CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the Clerk of the Court, using the CM/ECF system on April 28, 2015, which will send notification of such filing to all counsel of record.

s/ Jonathan J. Papik

4823-6347-2675, v.  2

21